Good morning, Your Honors. May it please the Court. I'm Maureen Graves and I'm here representing the appellant J.O.R. and his parents. His parents will be back in a minute. And my colleague John Nolte is at council table. I would like to reserve five minutes for rebuttal. We're here on an appeal of a fee order based on a hearing and a subsequent federal appeal and settlement on the merits in a case under the Individuals with Disabilities Education Act. And in that fee order, the district court cut the plaintiff's fees by almost 90 percent to about one-eighth of what was being requested. The fees that the court granted were approximately sufficient to attend the 11-day due process hearing, but not to do for any of the other work in the three years that this case was pending. The court reached this result through what we believe were a series of legal and factual errors and abuses of discretion. There were four main problems. The first is that the court miscalculated the lodestar figure, eliminated about half of our time worked on the case based primarily on factual and legal errors. Secondly, the court then proceeded to cut payment of that lodestar figure to one-fourth of what we were asking for based on perceptions that we had had modest success and that the hearing had perhaps not really been mainly about the issues on which we prevailed. And it's a yes. Is it your practice, followed in this case, to meticulously keep contemporaneous timesheets and furnish contemporaneous timesheets to the trial judge? Is that your practice? We try. And we did not – what we submitted to the trial court were timesheets which were edited to remove time that was not properly billed to the case. We took out time for continuances which were based on personal continuances. There were not challenges to the timekeeping per se. There were challenges to the amount of time, and the court did not rely on any apparent skepticism about whether the time was actually right. But there was some criticism from the court that it was not possible to identify which of the various – assuming they were separate claims – which of the claims were independently addressed by given time. Right. And I think the question there was not whether the time was worked, but our failure to document as we were going what time we were working on. And, in fact, that is true. I do not believe it is possible in my practice to contemporaneously document whether I'm doing that in my timekeeping practices when I switch to working on autism for a few minutes. I'm putting together documents, testimony, which move rapidly from one issue to another. So what we suggested, given that we hadn't done that in our bills, there was no evidence that's the standard of practice or something that anyone really manages to do in this area. What we did instead was we made a careful analysis of the record showing that 60 percent of the time at hearing was spent on reading and written language. The ALJ also noted the same thing, which is that it was mostly about written language. And, indeed, a year before the fee application, Mr. Harbottle, in a joint report to the court, observed that I had decided to spend my time at hearing on reading on the language exclamation point. So we don't think there's really any serious question that that's what the hearing was about. Counsel, do you agree with your opponent that each of the 19 issues identified by the ALJ is a separate, unrelated claim? Separate from every other claim and unrelated? Yes. The comment to which I was referring by district counsel is SCR 273, by the way. No, we do not. We believe that almost all the claims were related. Some of them were not claims at all. Some of them were theories, were legal theories. So, for example, we had an argument that the transition requirements and purposes of IDEA require that when you have a bright student who can learn to read and for whom there are readily available techniques to teach him to read and write, you need to do that. And the district court did not, the ALJ did not accept that theory. However, she said pretty much the same thing. This is a bright kid. It's important for his future that he learn to read. So that was, under Hensley and under many other cases, you're not, a district court is not supposed to remove time for theories that were not explicitly adopted or even that were actually rejected. Lawyers are expected to advocate zealously and to put forth all the evidence, all the legal theories that may support their case. And even It seems like the major point of contention between the two sides, rather than the rhetoric and polemics aside, turns on the definition of related and unrelated claims. And what is your position with regard to those 19 issues? Are they relevant to a determination of claim? If they're relevant, how are they relevant? Well, first of all, we think that the issue is how much time was spent on unrelated claims. So even if certain claims were unrelated, the proper course would be to deduct time, which at most, you know, could conceivably be 40 percent if you thought everything else was unrelated to reading and written language. The ALJ said most of the hearing was about those issues. We documented 60 percent through a careful sampling of the record. So at most, you would knock off 40 percent if everything were unrelated. However, the only issue that I would say is minimally related are the issues having to do with his autism and the social-emotional issues insofar as they related to autism. That was a separate set of issues that we were not able to do with much at hearing, because the teachers basically said, well, he seemed fine to us. Several of the teachers said he seemed fine to them in reading as well, but with reading and writing, we had specific data we could point to. When they said this autistic child behaved fine at school and was fine with other children, there was really nowhere we could go with that. So it took very little time at hearing. However, that, I would say, was minimally related to the other issues. Otherwise, when a fourth through sixth grader can't read or write, that has pervasive effects in all areas. The judge, I believe, knocked out all of the other subject matter areas. And our point about math was people were reading math tests out loud to him so that he could show what he knew on the test, but he wasn't getting his answer. He couldn't read the books. He couldn't read the social studies books. He couldn't read the science books. The concern about staff training that we raised was a concern about language exclamation point. And although the judge didn't give us that as a prevailing issue, she did agree that the staff had not understood the language that Garden Grove had purportedly adopted and used. So in a sense, we convinced her on that, even though she didn't label that a prevailing issue. So first of all, I would say that it's not the number of prevailing issues. It's the amount of time spent on issues which were neither winning issues nor related to winning issues. We think there was very little of that time. And the district has never really denied that. It's accused of attempting to reconfigure the record to suggest that our efforts were devoted to reading in written language. But, in fact, they were. The district knows that. They pointed that out to the district court themselves a year before the fee application. I think you reduced your research in the language exclamation point curriculum from 57.8 to 10.8 hours. Your explanation was that you didn't have the experience with that curriculum and you hadn't been in a case so focused on that. Well, having come out of I've been managing partner of two law firms and I've had to justify our bills to clients. And one of the things that comes up as a frequent objection is your associates went to school on this client. They're exorbitant billing rates. What's your response to the notion that you had to get geared up in this case because you didn't have the experience in it? So at five hundred dollars an hour, you were charging them almost 60 hours times five hundred dollars an hour to get up to speed on this curriculum. Why shouldn't that be subject to a discount? Well, that wasn't the theory underlying the discount. The theory was I should have been able to do it in much less time. And I think that one of the lessons of Moreno and Najara is that the district court needs to explain its actual rationale and let that be reviewed. But I think that the record is clear that, well, first of all, it is not the case that there are any special education lawyers who go around knowing about each curriculum used in a school district. This is one of numerous curriculum approved for school districts in California. There's not anyone who would know this. I spent no more time learning about it than the teacher who was supposed to be teaching it, than the district's trainers. They had actually worked with it for years. And I managed to realize things that they were doing wrong, parts of the material they had not understood. At one point, they had gone through week-long trainings. I did not have the benefit of the company. I did it on my own, and I understood it better in the ALJ's view than the people that were supposedly working with it. The ALJ also indicated at one point that if she actually read all the documents on the program that we wanted to put into evidence, it would take her six uninterrupted weeks. I charged for 60 hours. I think I did that very efficiently. I think it was absolutely critical to winning the case. And I think, you know, as Judge Posner pointed out, one of the key questions when a district is wanting to cut time on a bill is could the plaintiff's counsel have possibly won without doing this work. We wouldn't be here today. J.O. wouldn't have won the case if I hadn't done that work. And I don't think the district has seriously questioned that, except to say I should have relied on an expert who they attempted to disqualify who could only testify about implementation, because I had been able to extract very detailed information about implementation. That leads me to a follow-on question. To what extent did the district court create reasons or cuts that weren't argued for by the defense? To a very extreme degree, Your Honor. The school district made arguments below to try to get rid of our entire hearing request, mis-citing the Latke-Mawalia case for the theory that since initial pleadings are by definition pre-filing, plaintiff's counsel can't get paid for them. We pointed out that that was absurd, and the court nonetheless gave them almost all they were asking for based on a time objection they had not formulated. The district did not object to the number of hours spent at hearing. They didn't object to our having read the transcript. And there, the district court, you know, missed, well, for some reason doubted that this had anything to do with J.O.'s case, even though it was on the bill for this case, and it was in anticipation of a settlement conference, and then also ignored a discussion in my declaration of why we need to read transcripts carefully and why we did it in this case. I only have three minutes left, so if I could reserve that for rebuttal, I'd like to. Okay. Good morning, Your Honors. May it please the Court. Dan Harbottle for Garden Grove Unified School District. And I want to begin by pointing out a distinction that's been crystallized for me, both in reviewing the record and listening to counsel this morning, and that is the distinction between a lack of reward or award and punishment. I think a large portion of counsel's objection to the district court order was her view that it punished or penalized her in some manner that was unreasonable. And having lived through this, having lived through the district court case, and having seen it unfold, I think there was simply an appropriate, and just within discretionary powers, failure to reward unreasonable activities. Now, wait a minute, counsel. I have one question here. The district court did not preside over most of this case, isn't that correct? That is correct. That was all the ALJ. That is correct. So this is not the usual case where a district court has been actively involved in the litigation of the case. That's true. It did not try the case. And so when we look at what the district court said in this case, I think he denied fees, for example, for a brief filed before the ALJ because the ALJ said something about footnotes. It was he drafting the closing brief. Sixty almost sixty one hours reduced to zero because the brief was improper due to excessive footnoting. Yes, Your Honor. Was that brief filed before the district court? It was filed with the district court as part of the record of the Lumina Tri- But it wasn't filed before the district court. That's correct. And as the ALJ refused to accept the brief? No, that's incorrect, Your Honor. She did review it. And I think that's a very important point. And that goes to this distinction I was making, that it's within the district court's discretion to fail to award. That's different from punishment. I find it difficult as a judge to say that if I were to if we were on appeal to determine someone's entitlement to fees as a prevailing party, reduce them to zero because they did excessive footnoting. I would consider that to be a sanction. I would be trying to send a message to somebody that I can't believe that excessive footnoting could justify ignoring the brief in its entirety. I think it's important to realize that the IDEA permits reduction. I am fully familiar, counsel, with what the IDEA permits and allows district courts in going over fees. We have lots of fee cases. We have actually a commissioner who specializes, and we use his services, in evaluating fee requests. But that does not mean a district court can impose harsh judgments on fees. And I'm particularly concerned in this case because the district court was sitting in a position where he was essentially acting more of an appellate review than a direct review because it wasn't a case that was primarily litigated in front of him. It wasn't, Your Honor, but the fee motion was. And just for as an example, the this is within the district court's right, and I will not disagree with you that that was a significant act on his part, but it was an appropriate act. Why? Because the overall pattern of the case, as reflected in all the briefs, in fact, in this court as well, was excessiveness. And let me just give you an example. But you're saying it's not a punishment. No. What I hear you saying is that she over-litigated the case, over-argued, over-briefed it, and therefore, as a reward? No. You're saying that that brief had no impact on the ALJ? I'm saying, Your Honor, that the IDEA, as most fee-shifting statutes, do not entitle fees. They permit application for those fees. And it is the district's. Isn't that completely fair? Because Congress has made it clear that the whole purpose behind fee-shifting is to assure that certain classes of favored by Congress litigation are vigorously and thoroughly prosecuted without regard to the amount to be gained. As Justice Powell points out, in Farrar, I believe it was, or Riverside, the Congress was aware that the typical way that impecunious people get legal assistance is through the contingent fee. And the contingent fee is only a reasonable alternative to fixed hourly fees where the likely award or reward is sufficient to generate enough to compensate attorneys for their time. Are you prepared to say two things? First, that an attorney on the marketplace could be hired to do everything that had to be done in this case to achieve the result that Joe R. received for $50,000? Yes, Your Honor. And because we'll turn, if you don't mind, to the ‑‑ I'm glad to talk further about the closing brief issue, and I think that's an important point. Okay. And when you answer that question, would you identify where in the record you objected to the fees that were charged, where the district court was essentially following your objections instead of coming up with on its own? Well, first of all, I think it's within the court's discretion to find that. I understand that. I just want to know. We also say that there's case law in the circuit that says you look to what the defendant has the first order of business, because if the defendant isn't challenging them, then there's an assumption that the defendant has made a judgment, having litigated the case, thinks that they're within the bounds of reason. We were unable to address all of the excesses. Okay. Why don't you go ahead and answer? Okay. But just as an example, and I want to use ‑‑ I'll go back and forth here real quickly, because I think it's an important point. What we did and what the district court did appropriately was not do an hour‑by‑hour analysis of every task that was done. What it did was look at a sampling of particularly important pieces of work where direct comparisons were made and could be made, whereas in other cases they couldn't be, and it would be less of an analytical device, useful device to use. For example, the mandatory mediation conference that was ordered under the federal rules. I think counsel and her colleague billed, I would have to ‑‑ I think it was almost 20 hours for what turned out to be about a six‑hour actual conference. We billed six and a half hours for including travel and other material. It was about ten times the number of dollars and about four or five times the number of hours. So you're telling us that the total bill your law firm submitted to the district was for $50,000 or less? It was more than $50,000, but this is why your point is important, because it was less, it was nearly as little bit over half what counsel was awarded in the $200,000 figure. In other words, if you discount the degree, if you ignore the degree of success test completely and assume all the issues are related to each other, our bill to this district was tens of thousands of dollars less than the lodestar figure awarded by Judge Carney. Tens of thousands, $80,000 or $90,000 less over the course of the OEH case and the district court case. But then you look at the degree of success test. And we, as somebody pointed out, I think your Honor pointed out, there were 19, there were actually 20 issues pled, 19 adjudicated because counsel let one fall, 19 issues adjudicated and the degree of success test was applied to reduce that to six out of 19. Now ‑‑ With no explanation. Well, there was an explanation as to how they ‑‑ that they were arguably related to each other. Based on what? Well, based on the ‑‑ he listed the issues that he believed were arguably related to one another. Based on what? Based on the subject matter of the issues. For example, one that I thought was particularly important and generous was speech and language. Judge Carney determined on his own accord that speech and language services or that issue were, those issues were related sufficiently to the reading and language, reading and writing, to be encompassed in that group. However, that issue is the one that, another issue that points out the excess here. Speech and language was an alleged issue, a claim against my client that we had insufficiently served this student in speech and language. We prepared for that. We prepped for that. We had people ready to testify about that. And counsel didn't put on any evidences to that. So we didn't call our people. Counsel vigorously objected to our not calling our people because she wanted to question our people. There was ‑‑ the ALJ, if you look at that decision carefully, and I think that's the real key thing, that the ALJ who did try the case clearly indicated in numerous instances that we and she were required to work this case to the point where we did. According to counsel, it would have taken six full weeks of attorney time to read the entire record counsel proposed, including entire academic texts. And then counsel didn't put on any evidence on speech and language. And then objected and sought in the closing brief 200 hours of speech and language services, having not put on a single bit of evidence about it. That is precisely what happened in this entire case. We were brought to believe that there were these 19 issues. We prevailed on all of them to some degree. Only two of them we prevailed on partially. And when you get to your Honor's point and connecting the two pieces here, we prevailed on 17 out of 19. Counsel prevailed generously on six or some other number. And Judge Carney had it within his discretion to list what he believed based on the record that you still have yourselves, you also have yourselves, as to which were related. And then in terms of the pure dollar figures, then her fees were appropriately reduced. You know, the degree of success test was not applicable in the Ninth Circuit for a long time. And it's cases like this that require that it be implemented here. Well, but the degree of success as articulated initially by Henley and then thereafter has two components. One, to isolate those claims that are totally unrelated, appropriate for separate lawsuits, and deduct time spent exclusively on those with no carryover to others. And second, a determination of what's left, how much would it cost to get an attorney to litigate those issues? That's exactly right. Exactly right. And this harkens back to something counsel indicated during her first round. It's the moving party's burden to do that, to present that position. Counsel herself said she has not done it. Now, Judge Carney cannot be required to do what counsel did not do. Counsel did not segregate the issues. Counsel knows that the degree of success test exists in this jurisdiction. She knows that if she wants this $400,000 in fees and she wants to succeed in the analysis that's, in her case, in her view, inevitable, she will have to meet the standard under Henley and Aguirre. That was not met. And today you heard, that was not done. Now, it is not Judge Carney's obligation to do that. And he said this. Having not seen that analysis, I'm going to do the best I can here, and the best I can. All right. So just so I'm completely clear on your argument. Yes, sir. It is possible to argue that a plaintiff seeking attorney fees is listing fandom hours, hours that weren't worked, hours that no time was spent on, an outright lie. Or that counsel worked the hours but can't adequately explain them. I don't know about the former, because I wasn't there during those times. And I haven't made an allegation to that effect. I think a lot of it was excessive, whether there was unbilled or time spent not billed or otherwise. But the latter clearly happened. It clearly happened. One of the first questions that came out of the panel was, do you keep records? Do you know what you're supposed to do to keep records to substantiate this? This is the key thing. I think underlying all of this is Judge Carney was presented with a fee motion and an application. That in itself was improper, frankly. But he adjudicated it, as he was supposed to do. He was presented with very unsubstantiated line items, and he did the best he could with that. Was there any discussion between the court and counsel to address those? In other words, was there a hearing in which he posed his problems to counsel? No, Your Honor. The counsel presented a proposed order to him, as is her right and duty. And in that proposed order, she permitted, she permitted, and in her moving paper, she explicitly essentially offered that no oral argument occur. The proposed order explicitly permits that result. And in the moving papers, which didn't need to be done, counsel refers to her own proposed order and indicates a willingness to be, to present the matter to the court if he determined that it was not necessary to have oral argument. She didn't, she did not say, let's say this, these are so complicated. My billing statements are inadequate, but I can explain them. None of that happened. Counsel submitted this thing as if it were sufficient, permitted the court the opportunity procedurally to decide the case without oral argument, and that's exactly what happened. I'm glad to come back. I'm glad to answer further questions if you have any further. My time is up, obviously. Thank you. I'd like to address several of the things that Mr. Harbuttel said. First, on the issue of speech and language services. Speech and language is clearly relevant to reading and written language. In fact, one of our main arguments about reading and written language was that J.L. lacked the listening comprehension and the knowledge of oral English to understand what he was supposed to be reading in the language exclamation curriculum, and he wasn't getting the English learner supplement. So the issues were very clearly related. Moreover, we put on. His argument, though, was you essentially didn't put on evidence related to that, and so they developed witnesses and took the court's time preparing for it, and then you didn't follow through on it. Well, we did put on witnesses, and one of the witnesses that we put on was a professor of linguistics who trained speech and language therapists, and she testified that the speech and language goals for the student were inappropriate, that you shouldn't be trying to get him to focus consciously on sound articulation issues that take microseconds to produce. You should help him develop automaticity. And other witnesses testified about the breadth of his language needs, and during the hearing, the district represented that it was planning to call it speech and language pathologist. I believe when I asked questions about speech and language to the teacher, he said, well, she's going to be testifying, and the judge said, yeah, the speech and language pathologist will be testifying. In the end, he decided not to put him on. But we put on evidence by a trainer of speech and language pathologists that the goals were inadequate, and also there was evidence in the record that after our firm became involved and started saying, well, doesn't he have autism, it was noticed that he had pragmatic language issues, and for the first time he was given pragmatic language goals shortly after our involvement that hadn't been there through the first two years of the period in controversy. So we think there was a fair amount of evidence about that. The judge did not credit that evidence because it wasn't by a speech and language pathologist, and as is the case with many of Mr. Harbottle's theories that I engaged in excess, what he really seems to be complaining about is I didn't do enough. I didn't find or pay for a speech and language expert witness. I didn't monitor Prentiss on a daily or weekly basis to see if they were still certified the way they had been when the case started. I should have done a better job editing the brief so that I wouldn't have had so many footnotes and could have nonetheless preserved content. So many of the things that he calls excess are not particularly excess. They seem to be suggestions that I should have done more work. Secondly, he's suggesting that there were frivolous issues, and that was an argument that he made. One of the reasons that this fee application was so time-consuming is that after the hearing, after we had won one of the three largest Lindemood-Bell remedies in the 78 cases since this hearing system started since 2005, where students have requested that very common remedy, one of the three top cases he argued that we were not entitled to fees and that, in fact, we were responsible. I assume I was responsible for the district's fees because of a frivolous filing. So we were facing extreme hard-line resistance at every point, and I think we get you're seeing some of that here. The district has not presented any evidence that fees should be cut because a party does not win on everything they ask for. We presented many citations to the effect that that's not how you do it. We proposed numerous alternative metrics for evaluating success. It was what the student had been seeking. It was what the pediatricians had been asking for. It was a top relief, comparatively speaking. It was enormously beneficial for the student, and the district did not contradict any of our evidence that this was an outstanding remedy for a student. They didn't contradict any of our evidence about how hard an environment this was in which to be working and how rare and excellent that victory was, nor did they identify a single thing that we didn't need to do in order to win it. Can you comment on the oral argument issue? I do not think that ñ I mean, I remember when I did the order, I said, you know, I was trying to do a complete order. I think I was following a model, and I knew that the court didn't have to have an oral argument. So I think I put that in there. I don't remember ever suggesting the court that it not have an oral argument before, and, you know, I certainly wasn't thinking that the court was going to knock out seven-eighths of the fees without, you know, based on questions about whether things were related to the case without checking whether that was true. Also, Your Honor, the district has put on no evidence that bills are the sole place to look for whether issues are related. And we've put on numerous ñ cited numerous cases to the effect that courts try hard to find out what actually happened, and they've never suggested that their own bills contain contemporaneous accounts of how exactly time was spent. They have suggested that our ñ you know, and as for whether they've ever complained that our ñ that we were lying, in fact, they did tell the district court that our time on the fee motion was completely, grossly implausible. So I think that they have tried to create sort of an atmospherics at all points of excess. We have cited comparable special education cases where parents got partial remedies after hearings, most of them shorter than this, some of them similar, in which parents got very large fee awards, and they have proposed very different cases and have essentially ñ also, Your Honor, on the penalty question, you know, the district seems to want to have it both ways. In their briefs, they argued it was fine for the judge to penalize me. Now they're arguing that he simply wasn't rewarding me. If there was a penalty, we need to know about it. I don't see how cutting 98 percent for the fee motion, giving me two hours, which was then reduced by 75 percent, so 30 minutes, to meet the requirements of AGIRRA to defend our right to fees under prevailing law. I don't see how there's any way that's anything other than a penalty. But it wasn't explained that way or justified that way, and I think we're entitled to an explanation. My time's way up. Sorry. I have a question for counsel. I'm looking at the motion that is counsel for the district. I'm looking at the motion for fees. I'm looking at page 2, and the sentence says, a motion date is being requested in case the court will want oral argument on this matter. Is that what you were referring to? Yes, sir. I don't think that's a fair reading. Thank you. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted. We're adjourned.
judges: Singleton, Fisher, Clifton